Peoples Gin Company v. Commissioner.
Peoples Gin Co. v. Commissioner
Docket Nos. 111436, 452.
United States Tax Court
1943 Tax Ct. Memo LEXIS 244; 2 T.C.M. (CCH) 325; T.C.M. (RIA) 43304; June 21, 1943
*244 Nelson E. Taylor, Esq., Greenwood, Miss., for the petitioner. James L. Backstrom, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined deficiencies in income tax and excess profits tax for the years 1935 to 1940, inclusive. Docket No. 111436 involves income and excess profits tax deficiencies for the fiscal years ended July 31, 1935, and July 31, 1936, as follows: Excess
Years
Income Tax
Profits Tax
1935
$795.08
$219.38
1936
$707.94
$420.38 Docket No. 452 involves deficiencies in income tax, excess profits tax and declared value excess profits tax for the fiscal years ended July 31, 1937, July 31, 1938, July 31, 1939, and July 31, 1940, as follows: Declared
Value
Excess
Income
Excess
Profits
Years
Tax
Profits Tax
Tax
1937
$2,864.62
$1,767.93
1938
2,686.23
1,172.26
1939
688.73
94.45
1940
2,322.09
$1,468.39
The principal question for determination is whether amounts returned by petitioner to its stockholder patrons pursuant to written agreements with them, which amounts represented the excess over the cost of ginning their cotton and selling their cotton *245 seed, were deductible from petitioner's gross income as part of the cost of goods sold. There is, also, the further question as to whether respondent's determination of deficiencies for the years 1937 and 1938 is barred by the statute of limitations. Findings of Fact The petitioner is a Mississippi corporation with its principal place of business at Lambert, Quitman County, Mississippi. It files its income tax returns on the basis of the fiscal year ending July 31 of each year. For the years 1935 to 1940, inclusive, the returns were filed with the collector for the district of Mississippi. Petitioner keeps its books and makes its returns on the accrual basis. Petitioner was originally chartered on July 27, 1933, with an authorized capital stock of $5,000, divided into 100 shares of common stock having a par value of $50 per share. On January 18, 1935, petitioner's charter was amended to provide for an authorized capital stock of $20,000, divided into 400 shares at a par value of $50 per share. Petitioner was organized by a group of farmers engaged in the production of cotton for the purpose of purchasing and operating a public cotton gin. The purpose of petitioner as declared *246 by its charter was as follows: To own and operate a public cotton gin; to own all necessary real estate for the proper operation of said business; to gin cotton, buy and sell cotton, cotton seed, corn, farm tools and farm machinery and implements, and to do all things necessary for or incident to said business. The rights and powers that may be exercised by this corporation, in addition to the foregoing are those conferred by Chapter 100, of the Mississippi Code of 1930. It was the intent of the incorporators and stockholders in organizing petitioner to secure facilities for ginning its stockholders' cotton at cost, and to have the profit from the sale of the stockholders' seed refunded to the respective stockholders in proportion to the number of bales of cotton they ginned. They also intended to produce a better sample of the cotton for marketing and to do some public ginning. On December 8, 1933, petitioner's stockholders held a meeting and adopted by-laws which, among other things provided as follows: The Capital stock of the Corporation shall be divided into shares of $50.00 each, to be sold to persons actually engaged in the production of cotton. Division of Profits: Each *247 stockholder ginning cotton at the ginnery of the Corporation shall pay to the Corporation the ginning charge set by the Directors, and shall be paid at the gin the current market price for cotton seed. Each year, after the close of the ginning season, the net profit earned by the actual ginning operations, the net profit earned on cotton seed purchased by the gin, as well as all other net profits of the Corporation, after all necessary expenses have been paid, shall be divided between the stockholders in that proportion which the number of bales of cotton ginned by each stockholder at the ginnery of the corporation bears to the total number of bales ginned by the ginnery for that season. The profits allocable to the cotton ginned for non-stockholding customers shall constitute company or corporate profits, and shall be divided either in proportion to the stock held by the stockholders, or credited to the surplus and undivided profits account. On May 5, 1934, at a meeting of the stockholders, the following resolution was unanimously adopted: Whereas all the stockholders have spent considerable time and money in organizing, the soliciting and securing customers for the gin. And *248 further, it is seen that the profit from the outside ginning (cotton ginned by non-stockholders) will take care of all payments of notes, and other obligations. It is therefore resolved that the by-laws on page seven (7) be changed to read: Each year, after the close of the ginning season, before the net profits of the gin are declared that each and every stockholder be reimbursed any amount that he has paid into the gin in excess of actual cost of ginning his cotton. In other words that all stockholders' cotton be ginned at actual cost. In all the taxable years here involved, there was in effect between petitioner and each of its various stockholders an agreement identical in form with the following, except that in each case the name of the stockholder was different: Lamber, Mississippi, August first, 1934. The Peoples Gin Company, Inc., agrees to pay to H. E. Anderson the full sale value for all seed ginned and left at this gin by him, less the necessary handling and selling expenses and to gin his cotton at cost, and final settlements to be made at the end of the ginning season when all expenses and profits have been determined, and this agreement shall continue from year to *249 year, and until cancelled by either party. PEOPLES GIN COMPANY INC. By C. W. McCullar, President. ACCEPTED: E. H. Anderson All of the patrons of the gin were treated alike as to the prices per ton paid for the seed and the charges exacted for the ginning of the cotton, so that the cost of the cotton seed purchased from stockholders and non-stockholders was the same, and the revenue derived from the ginning operations were at the same rates; some rebates were paid to the non-stockholder patrons. The cotton seed was commingled and sold on the market for whatever it would bring. If the customer did not deliver his seed to the gin, but took it away, he was charged the regular and customary fee for the ginning. It was the custom in Lambert, Mississippi, and throughout the Delta, for gins to pay rebates to their customers, whether or not they are stockholders, and petitioner's stockholders could have obtained rebates for all or a part of the profits from other gins for ginning their cotton. These rebates have ranged from a small amount to practically all of the gin's profits. There were two other gins in Lambert, Mississippi, which were more than was necessary to gin the cotton *250 in the vicinity. Petitioner's stockholders were the former customers of these gins and they could have secured substantial rebates from them for the ginning of their cotton. Petitioner entered into the written agreements with its stockholders in order to satisfactorily assure them that they would get their rebates. Before making any rebates to the stockholder patrons, the total apparent profits for the fiscal year would be determined, and then the percentage of the number of bales ginned by each stockholder to the total number of bales was determined, and those percentages so obtained were applied to the total profits, to ascertain the amounts due to be returned to the respective stockholders. Those amounts were then credited to the stockholder's account, and the difference paid in cash or by check. Usually the stockholder would have some charges against his account for ginning or seed advances, so that the distributions were either credited or paid in cash. There was no relation between the rebates or "patronage distributions" and the shares of stock held by the stockholder patrons, and the shares of capital stock in no way participated in the rebates or "patronage distributions." *251 The capital stock participated exclusively in the regular dividends paid out of surplus profits or corporation profits from non-stockholder business, but no rebates in the way of "patronage distributions" were bade or distributed to any of the stockholders from the corporation profits or surplus. No dividends were paid on the capital stock of petitioner during either of the fiscal years ended in 1935 or 1936. The outstanding capital was increased by a stock dividend of $13,950 declared from surplus, increasing the outstanding capital to $18,900, and in 1937 a dividend of 8 percent was paid amounting to $1,512. The same dividend was paid in 1938. In 1939, the dividends paid to stockholders amounted to $1,560, and in 1940 they amounted to $1,564. All dividends paid on the capital stock were paid from and charged to the surplus accounts, and no other dividends were paid on the capital stock. It was the policy of the petitioner to sell stock to any of its non-stockholder customers when they wanted to become stockholders. The percentage of outside ginning was thus reduced and the stockholder ginning increased from 66.95 percent for the fiscal year ended in 1935 to 90.20 percent for the *252 fiscal year ended in 1940, and the number of stockholder patrons increased from 6 to 22. The following is a statement showing sales and cost of sales of cotton seed and gin revenues and cost of ginning distributed between stockholder and non-stockholder patrons: Totals
Stockholders Cotton
Bales
Per
Bales
Per
Ginned
Cent
Amount
Ginned
Cent
Amount
For Fiscal Year Ended
7-31-1935
Cotton Seed Sales
2,257
100
$42,195.39
1,511
66.95
$28,249.81
Less Cost of Seed Sold
2,257
100
39,085.96
1,511
66.95
26,168.05
Excess of Sales over Cost
2,257
100
$ 3,109.43
1,511
66.95
$ 2,081.76
Total Gin Revenue
2,257
100
12,227.97
1,511
66.95
8,186.62
Less Ginning Costs
2,257
100
9,461.79
1,511
66.95
6,334.66
Excess over cost charged
for Ginning
2,257
100
2,766.18
1,511
66.95
1,851.96
Totals
2,257
100
$ 5,875.67
1,511
66.95
$ 3,933.72
For Fiscal Year Ended
7-31-1936
Cotton Seed Sales
2,066
100
$37,488.84
1,329
64.33
$24,116.57
Less Cost of Seed Sold
2,066
100
32,254.52
1,329
64.33
20,749.33
Excess of Sales over Cost
2,066
100
$ 5,234.32
1,329
64.33
$ 3,367.24
Total Gin Revenues
2,066
100
10,863.51
1,329
64.33
6,988.49
Less Ginning Cost
2,066
100
10,949.20
1,329
64.33
7,043.62
Excess of Cost over Reve-
nues
2,066
100
(85.69)
1,329
64.33
(55.13)
Totals
2,066
100
$ 5,148.63
$ 3,312.11
For Fiscal Year Ended
7-31-1937
Cotton Seed Sales
4,300
100
$95,688.20
2,777
64.01
$61,250.02
Less Purchases
4,340
100
87,838.05
2,777
64.01
56,225.14
Excess of Sales over Cost
4,340
100
$ 7,850.15
2,777
64.01
$ 5,024.88
Total Gin Revenues
4,340
100
$25,412.28
2,777
64.01
$16,266.40
Less Ginning Cost
4,340
100
17,609.08
2,777
64.01
11,271.57
Excess over Cost Charged
4,340
100
$ 7,803.20
2,777
64.01
$ 4,994.83
Totals
4,340
100
$15,633.35
2,777
64.01
$10,019.71
For Fiscal Year Ended
7-31-1938
Cotton Seed Sales
5,854
100
$69,959.16
3,946
67.35
$47,117.49
Less Cost of Seed Sold
5,854
100
62,309.87
3,946
67.35
41,965.69
Excess of Sales over Cost
5,854
100
$ 7,649.29
3,946
67.35
$ 5,151.80
Total Gin Revenues
5,854
100
33,177.60
3,946
67.35
22,345.11
Less Ginning Cost
5,854
100
24,594.37
3,946
67.35
16,564.31
Excess over Cost Charged
for Ginning
5,854
100
$ 8,583.23
3,946
67.35
$ 5,780.80
Totals
$16,232.52
$10,932.60
For Fiscal Year Ended
7-31-1939
Cotton Seed Sales
3,942
100
$54,697.03
3,095
78.50
$42,937.17
Less Cost of Seed Sold
3,942
100
54,087.88
3,095
78.50
42,458.99
Excess of Sales over Cost
3,942
100
$ 609.15
3,095
78.50
$ 478.18
Total Gin Revenue
3,942
100
$22,362.44
3,095
78.50
$17,554.30
Less Ginning Costs
3,942
100
16,101.36
3,095
78.50
12,639.57
Excess over Cost Charged
for Ginning
3,942
100
$ 6,261.08
3,095
78.50
$ 4,914.73
Totals
3,942
100
$ 6,870.23
3,095
78.50
$ 5,392.91
For Fiscal Year Ended
7-31-1940
Cotton Seed Sales
4,560
100
$63,130.85
4,113
90.20
$56,944.03
Less Cost of Seed Sold
4,560
100
48,294.10
4,113
90.20
43,561.20
Excess of Sales over Cost
4,560
100
$14,836.84
4,113
90.20
$13,382.83
Total Gin Revenue
4,560
100
23,281.46
4,113
90.20
20,999.88
Less Ginning Costs
4,560
100
17,761.95
4,113
90.20
16,021.28
Excess over Cost Charged
for Ginning
4,560
100
$ 5,519.51
4,113
90.20
$ 4,978.60
Totals
4,560
100
$20,356.35
4,113
90.20
$18,361.43
Adjustment for Income
Taxes
*253 Outside Cotton
Bales
Per
Ginned
Cent
Amount
For Fiscal Year Ended
7-31-1935
Cotton Seed Sales
746
33.05
$13,945.58
Less Cost of Seed Sold
746
33.05
12,917.91
Excess of Sales over Cost
746
33.05
$ 1,027.67
Total Gin Revenue
746
33.05
4,041.35
Less Ginning Costs
746
33.05
3,127.13
Excess over cost charged
for Ginning
746
33.05
914.22
Totals
746
33.05
$ 1,941.89
82.13
$ 2,024.02
For Fiscal Year Ended
7-31-1936
Cotton Seed Sales
737
35.67
$13,372.27
Less Cost of Seed Sold
737
35.67
11,505.19
Excess of Sales over Cost
737
35.67
$ 1,867.08
Total Gin Revenues
737
35.67
3,875.02
Less Ginning Cost
737
35.67
3,905.58
Excess of Cost over Reve-
nues
737
35.67
(  30.56)
Totals
$ 1,836.52
For Fiscal Year Ended
7-11-1937
Cotton Seed Sales
1,563
35.99
$34,438.18
Less Purchases
1,563
35.99
31,612.91
Excess of Sales over Cost
1,563
35.99
$ 2,825.27
Total Gin Revenues
1,563
35.99
$ 9,145.88
Less Ginning Cost
1,563
35.99
6,337.51
Excess over Cost Charged
1,563
35.99
$ 2,808.37
Totals
1,563
35.99
$ 5,633.64
For Fiscal Year Ended
7-31-1938
Cotton Seed Sales
1,908
32.65
$22,841.67
Less Cost of Seed Sold
1,908
32.65
20,344.18
Excess of Sales over Cost
1,908
32.65
$ 2,497.49
Total Gin Revenues
1,908
32.65
10,832.49
Less Ginning Cost
1,908
32.65
8,030.06
Excess over Cost Charged
for Ginning
1,908
32.65
$ 2,802.43
Totals
$ 5,299.92
For Fiscal Year Ended 7-31-1939
Cotton Seed Sales
847
21.50
$11,759.86
Less Cost of Seed Sold
847
21.50
11,628.89
Excess of Sales over Cost
847
21.50
$  130.97
Total Gin Revenue
847
21.50
$ 4,808.14
Less Ginning Costs
847
21.50
3,461.79
Excess over Cost Charged
for Ginning
847
21.50
$ 1,346.35
Totals
847
21.50
$ 1,477.22
For Fiscal Year Ended
7-31-1940
447
9.80
$ 6,186.82
Less Cost of Seed Sold
447
9.80
4,732.81
Excess of Sales over Cost
447
9.80
$ 1,454.01
Total Gin Revenue
447
9.80
2,281.58
Less Ginning Costs
447
9.80
1,740.67
Excess over Cost Charged
for Ginning
447
9.80
$  540.91
Totals
447
9.80
$ 1,994.92
Adjustment for Income
Taxes
142.81
$ 2,137.73
*254 Petitioner's income and excess profits tax returns for the years ended July 31, 1937, and July 31, 1938, were filed on September 23, 1937, and October 15, 1938, respectively. On October 7, 1942, respondent mailed to petitioner a notice of deficiencies in income and excess profits tax for those years. The returns showed gross income of $8,547.44 for the year ended July 31, 1937, and $15,047.60 for the year ended July 31, 1938, computed as follows: Fiscal Year Ended 7-31-37
Gross receipts reported on petitioner's return: Cotton Seed
$95,688.20
Gin Revenue
16,989.88
Bankhead Refund
485.75
Hauling
67.22
Remnant A/C
114.59
$113,345.64
Less cost goods sold: Seed Purchases
95,689.67
Manufacturing Costs: Bagging and Ties
$4,318.99
Drayage
716.56
Freight and Express
29.27
Fuel Oil and Grease
1,716.57
Labor
1,940.31
Supplies
247.55
Trailer Expense
139.29
9,108.53
104,798.20
Gross Income per Return
$ 8,547.44
Fiscal Year Ended 7-31-38
Gross receipts reported on petitioner's return: Cotton Seed
$69,959.16
Gin Tolls
22,752.15
Trailer Rentals
84.45
$ 92,795.76
Less cost goods sold: Seed Purchases
66,056.44
Manufacturing Costs: Allowances
$ 67.45
Bagging and Ties
5,275.00
Drayage
1,115.25
Freight and Express
24.63
Fuel Oil and Grease
2,189.27
Hauling
79.00
Labor
2,539.78
Remnants
72.86
Sundry Supplies
328.48
11,691.72
77,748.16
Gross Income per Return
$ 15,047.60
*255 Petitioner's gross income for the fiscal years ended July 31, 1937, and 1938, was actually $14,134.19 for 1937, and $16,934.58 for 1938, computed as follows: Fiscal Year Ended July 31, 1937
Gross receipts: Seed Sales
$95,688.20
Gin Tolls
24,744.72
Miscellaneous
667.56
$121,100.48
Less cost of goods sold: Seed Purchases
87,838.05
Rebates to Stockholders
10,019.71
Bagging and Ties
4,318.99
Labor
1,940.31
Fuel
1,716.57
Drayage
716.55
Supplies
247.55
Trailer Expense
139.29
Freight and Express
29.27
106,966.29
Gross Income
$ 14,134.19
Fiscal Year Ended July 31, 1938
Gross receipts: Seed Sales
$69,959.16
Gin Tolls
33,093.16
Miscellaneous
84.45
$103,136.76
Less cost of goods sold: Seed Purchases
62,309.87
Rebates to Stockholders
10,392.60
Allowances
67.45
Bagging and Ties
5,275.00
Drayage
1,115.25
Freight and Express
24.63
Fuel Oil and Grease
2,189.27
Hauling
79.00
Labor
2,539.78
Rebates to Non-stockholders
1,807.99
Remnants
72.86
Supplies
328.48
86,202.18
Gross Income
$ 16,934.58
In August 1940, petitioner's stockholders organized an association under the Agricultural Loan Adjustment Act, known as the Peoples Gin Association, *256 AAL, and petitioner's assets were sold to the new association. Petitioner did not engage in any business after the fiscal year ended July 31, 1940. The amounts distributed by petitioner to its stockholders in the years 1935 to 1940, inclusive, pursuant to written agreements with them, were rebates or refunds in the nature of "patronage distributions" and as such were deductible from petitioner's gross income as part of the cost of goods sold. Opinion Issue 1. The question under this issue is whether certain amounts returned by petitioner in each taxable year to its stockholder patrons pursuant to written agreements with them, which amounts represented the excess over the cost of ginning the stockholders' cotton and selling their cotton seed, are deductible from petitioner's gross income as part of the cost of goods sold. When their cotton was ginned, the stockholder patrons paid petitioner the same price as non-stockholder patrons for the ginning service and at that time petitioner paid its stockholder patrons the same price for their cotton seed that it paid to its other customers. At the end of the ginning season, petitioner pursuant to its agreement, returned to its stockholder *257 patrons the excess of the cost of ginning their cotton and the proceeds realized from the sale of their seed. Petitioner claims that by virtue of its by-laws, and under the written agreements with its stockholders, it was legally obligated to make such payments, and, as a result, the payments are deductible from gross income. Petitioner contends, further, that these payments constituted a rebate or refund of the excess of the amount paid by each stockholder patron over cost and never at any time belonged to or became the profits of petitioner. In support of this contention, petitioner relies particularly on Uniform Printing & Supply Co. v. Commissioner, 88 Fed. (2d) 75; and cites among others, Trego County Cooperative Association, 6 B.T.A. 1275; Home Builders Shipping Association, 8 B.T.A. 903; Anamosa Farmers Creamery Co., 13 B.T.A. 907; Farmers' Union State Exchange, 30 B.T.A. 1051; and Anderson-Clayton Securities Corporation, 35 B.T.A. 795. Respondent contends that the amounts *258 so distributed constituted a part of the corporate profits so that the distributions were dividends and no deduction is allowable in determining petitioner's net income. Respondent's contention cannot be sustained. The facts of this case bring it within the rule established by Home Builders Shipping Association, supra, and Uniform Printing & Supply Co. v. Commissioner, supra. There was a definite liability on the part of petitioner to pay its stockholder patrons the excess over the cost of ginning their cotton and selling their cotton seed. Payments of rebates or patronage dividends to stockholder patrons on the basis of their patronage are allowable where there is a definite liability to make such payments. Farmers Union State Exchange, supra.The fact that petitioner was organized under the provisions of Mississippi law dealing with the organization of general business corporations is not controlling. Home Builders Shipping Association, supra;Uniform Printing & Supply Co., supra. Petitioner was *259 organized by a group of cotton farmers for the purpose of operating cooperatively in having their cotton ginned and their seed sold at cost. All its stockholders were cotton farmers. Under the bylaws, the stock could be sold only to persons actually engaged in the production of cotton. The patronage distributions were determined upon the number of bales ginned for each stockholder in proportion to the total number of bales ginned during the year. The ginning business in Lambert, Mississippi, was highly competitive. There were three gins in the town and not enough cotton to be ginned to keep them all busy. As a result, it was customary for each gin to give substantial rebates to its customers. Petitioner's stockholders could have secured these benefits if they transferred their business to the other gins. It was for this reason that petitioner entered into the written agreements with its stockholders that the excess of the cost of ginning the cotton and selling the cotton seed should be returned to them. The agreements were not executed with the stockholders solely because they were stockholders as was the case in Fontana Power Co., 43 B.T.A. 1090; *260 affd., 127 Fed. (2d) 192, relied upon by respondent. Here, petitioner paid rebates to non-stockholder patrons which respondent in brief admits are deductible by petitioner as part of the cost of goods sold. Under the facts of the case we cannot see why a different rule should be applied to stockholder patrons. The same conclusion was reached under somewhat similar facts in Uniform Printing & Supply Co., supra, where it was said at page 76: Had the taxpayer given a customer (whether stockholder or outsider) a discount promptly after filling the order, no one would call it a dividend. If a rebate were given promptly upon the customer's business reaching a certain volume, the same conclusion as to its character would follow. To make cost estimates and adjust them at or near the end of each year returning the excess payment to the customer should not change the reasoning which leads to this conclusion. Nor should the fact that the customer is a stockholder materially affect the result. The Supreme Court of Mississippi followed the same rule in the case of State et al. v. Morgan Gin Co., 189 So. 817, *261 where it held that amounts refunded by the taxpayer to its stockholder patrons pursuant to agreements with them and based upon the volume of business contributed by them were not income to the taxpayer. Respondent relies on a decision in a former proceeding brought by petitioner entitled Peoples Gin Co., 41 B.T.A. 343 affd., 118 Fed. (2d) 72. However, in that case which involved the year ended July 31, 1934, the contracts and by-laws referred to here were not in effect prior to the ginning season and prior to the earnings of petitioner's income. The Circuit Court of Appeals in its opinion said: The petitioner contends here as it did before the Board that the payment of $3,684.70 to its stockholders was a "patronage dividend", a rebate or refund of excess ginning charges, and that this sum should have been allowed as a proper deduction from its gross income. In support of this contention it relies upon Treasury Ruling. A.R.R. 6967, Cumulative Bulletin June, 1924, p. 287: Uniform Printing & Supply Co. v. Commissioner, 7 Cir., 88 Fed. (2d) 75, 109 A.L.R. 966; Fruit Growers' Supply Co. v. Commissioner, 9 Cir., 56 Fed. (2d) 90; *262 Riverdale Co-op. Creamery Co.-op. Creamery Co. v. Commissioner, 9 Cir., 48 Fed. (2d) 711. This case is different from the cases relied upon by the petitioner. In those cases where the deduction was allowed the obligation to make rebates or refunds was in existence before the profits were earned. The resolution of August 9, 1933, relative to ten per cent dividend payments did not bind the gin company to make rebates or refunds to stockholders on a baleage basis. Until the adoption of the resolution of December 8, 1933, there was nothing in the corporation by-laws providing for a refund of excess charges to stockholder patrons. The distribution to stockholders which was made on January 15, 1934, was pursuant to the by-laws of December, 1933, which by-laws had been adopted subsequent to the earnings of the profits by the ginnery. When this income was received by the corporation there was no obligation to make refunds or rebates to stockholders. The profits from ginnings for stockholders, therefore, became a part of the gross income of the taxpayer, and the character of this income for tax purposes was not changed by the adoption of subsequent resolutions *263 and by-laws. * * * It is apparent that the crux of this decision was that at the time the income was earned there was no legal obligation on the part of petitioner to make the rebates or refunds to its stockholder patrons. The situation here is entirely different in that not only by-laws but written agreements were in effect prior to the earning of the income here involved, which obligated petitioner to make the refunds. Respondent also relies on Juneau Dairies, Inc., 44 B.T.A. 759. That case, however, is distinguishable since the taxpayer was required to pay to its stockholders a bonus of its entire net profit which included income from a non-stockholder patron. In this case petitioner paid tax on the income derived from its non-stockholder patrons, and the profits from this source became corporate profits distributed as dividends on the capital stock. Considering all the facts, it is held that the payments in question were made as refunds rather than as dividends to stockholder patrons. Petitioner is therefore entitled to deduct these refunds from its gross income in each of the taxable years here involved. Issue 2. Petitioner admits that, *264 even though it is allowed a deduction for amounts refunded to its stockholder patrons as part of the cost of goods sold, the returns filed by it for the years involved in this proceeding do not reflect its true income and that there are deficiencies in each year. It contends, however, that respondent's determination of deficiencies for the years ended July 31, 1937, and July 31, 1938, is barred by the statute of limitations. Petitioner filed its returns for these years on September 23, 1937, and October 15, 1938, respectively. On October 7, 1942, respondent mailed to petitioner a notice of final determination of deficiencies in income and excess profits tax for those years. Respondent relies on section 275 (c) and 275 (f) of the Revenue Act of 1938, which are as follows: SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - * * * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, *265 at any time within 5 years after the return was filed. * * * * *
(f) For the purposes of subsections (a), (b), (c), (d), and (e), a return filed before the last day prescribed by law for the filing thereof shall be considered as filed on such last day. The last day on which petitioner could have filed its 1937 return was October 15, 1937, as that was the 15th day of the third month following the close of petitioner's fiscal year. Section 53 (a) of the Revenue Act of 1938. The mailing of the deficiency notices on October 7, 1942, was therefore more than three years, but less than five years, from the filing of the returns by petitioner. It thus becomes necessary to determine whether petitioner, in each of the years 1937 and 1938, omitted from its gross income an amount in excess of 25 percent of the amount of gross income stated in the return. In the tables set forth in the findings of fact, in computing petitioner's gross income, the amounts refunded to stockholder patrons during each of the years involved are treated as a part of the cost of goods sold. At the hearing of the proceeding, both parties agreed that the figures in the profit and loss statements submitted by petitioner *266 for each of the years involved were correct. The computation of petitioner's actual gross income for the years ended July 31, 1937, and July 31, 1938, in the tables set forth in the findings of fact, are based upon those statements. The method of computing the gross income is determined by Article 22 (a)-5 of Regulations 94 and 101, [1] which are identical. In applying this method of computation, it is found that petitioner reported for the year ended July 31, 1937, gross receipts of $113,345.64 less cost of goods sold amounting to $104,798.20, leaving gross income in the amount of $8,547.44. In its return for that year it did not include as income the amounts refunded to its stockholder patrons. Its actual receipts for *267 that year were $121,100.48 less cost of goods sold amounting to $106,966.29, leaving a gross income of $14,134.19. In the latter computation, the amounts refunded to stockholder patrons have been treated as part of the cost of goods sold, which is in accordance with the holding made under issue 1. Inasmuch as the return filed by petitioner for the year ended July 31, 1937, showed gross income of $8,547.44, and petitioner's actual gross income for that year was $14,134.19, the provisions of subsection (c) of section 275 are applicable. Petitioner omitted from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return. Respondent's determination of a deficiency for the year 1937 is not barred. For the year ended July 31, 1938, petitioner reported in its return gross receipts of $92,795.76 less cost of goods sold amounting to $77,748.16, leaving gross income in the amount of $15,047.60. The amounts refunded to its stockholder patrons were not included as income. Its actual receipts for that year were $103,136.76 less cost of goods sold amounting to $86,202.18, leaving gross income in the amount of $16,934.58. *268 In this computation, the amounts refunded to stockholder patrons have been treated as part of the cost of goods sold. Since petitioner did not omit from 1938 gross income an amount in excess of 25 percent of the amount of gross income stated in its return, subsection (c) of section 275 is not applicable. Accordingly, assessment of the deficiency for the year 1938 is barred pursuant to subsection (a) of the Revenue Act of 1938. Decision will be entered under Rule 50. Footnotes
1. Art. 22(a)-5. Gross income from business. - In the case of a manufacturing, merchandising, or mining business "gross income" means the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources. In determining the gross income subtractions should not be made for depreciation, depletion, selling expenses, or losses, or for items not ordinarily used in computing the cost of goods sold. * * *↩